Filed 7/22/21  Spence v. State Personnel Board CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| KEN SPENCE,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>STATE PERSONNEL BOARD,<br><br>Defendant and Respondent;<br><br>DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>Real Party in Interest and Respondent. | D076853<br><br>(Super. Ct. No. 37-2019-00012524-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Wayne J. Quint and Chris Uyemura for Plaintiff and Appellant.

Alvin Gittisriboongul, Chief Counsel, and Chain He, Senior Attorney, for Defendant and Respondent.

Michael P. Doelfs for Real Party in Interest and Respondent.

Plaintiff Ken Spence appeals from the denial of his petition for a writ of administrative mandamus under Code of Civil Procedure[1] section 1094.5 (Petition) seeking to set aside the decision of respondent State Personnel Board (SPB or Board)[2] in *K.S. v. Department of Corrections and Rehabilitation* (case No. 17-1944; Dec. 13, 2018). SPB in this action affirmed in its entirety the decision of the administrative law judge (ALJ) upholding the penalty of dismissal of Spence from his position as a correctional officer (CO) at Richard J. Donovan Correctional Facility (RJD), an institution under the control of respondent and real party in interest Department of Corrections and Rehabilitation (CDCR).

On appeal, Spence raises several issues including that (1) the decision of the ALJ to invoke issue preclusion during the evidentiary hearing denied him due process of law as he was unable to present fully his defenses; (2) SPB denied him due process of law because it ignored its own case law requiring that he be subject to "progressive discipline"; and (3) the ALJ's findings he (i) asked a subordinate officer to withdraw a written complaint to the warden after he had failed to repay a loan and, when that officer refused, (ii) retaliated against the officer, is not supported by substantial evidence. We will affirm.

OVERVIEW

Spence began his employment with CDCR as a CO in September 1995. In 2001 he was promoted to correctional sergeant, and in 2006 to correctional lieutenant. In March 2017 Spence was demoted to CO, a position he held

---

[1] Unless otherwise noted, all further statutory references are to the Code of Civil Procedure.

[2] Respondent SPB filed a one-page brief stating it stood by its decision in the instant case and would abide by this court's ruling.

until he was dismissed by CDCR in November 2017. Spence's 2017 demotion is the subject of a related SPB precedential decision in *K.S. v. Department of Corrections and Rehabilitation* (case No. 17-02; Nov. 2, 2017) (*K.S.*; sometimes, Demotion Action).[3]

Demotion Action

While serving as a correctional lieutenant at RJD in the late 2000's, Spence borrowed money from three subordinate officers, including correctional sergeant Steven Vasquez, who eventually filed a written memorandum after Spence failed to repay him. During this time period, Robert Hernandez was the warden at RJD. Hernandez received Vasquez's memorandum sometime in 2008 or 2009 and spoke to Spence about the matter. (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at pp. 4-5.)

*Hernandez Instructed Spence Not to Borrow Money from Subordinate Officers*

In the Demotion Action, the ALJ found by a preponderance of the evidence the following facts: "Shortly after learning of the [Vasquez] complaint, Warden Hernandez spoke to Appellant [i.e., Spence] about the matter. Warden Hernandez told Appellant that it was inappropriate for a supervisor to borrow money from a subordinate employee and that Appellant needed to pay Sgt. Vasquez back. Warden Hernandez told Appellant not to borrow money from subordinate employees." (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at p. 4.)

---

[3]    On this court's own motion, we take judicial notice of the Demotion Action, which the parties repeatedly reference in their briefings to this court. (See *Jones v. Whisenand* (2017) 8 Cal.App.5th 543, 548, fn. 3; *California Public Records Research, Inc. v. County of Yolo* (2016) 4 Cal.App.5th 150, 168, fn. 8.)

3

In making this finding, the ALJ in the Demotion Action stated there was a conflict in the evidence but as trier of fact, found Hernandez's testimony more credible than Spence's, explaining his reasoning in part as follows: "Warden Hernandez testified that after he reviewed the complaint by Sgt. Vasquez, he spoke to Appellant about the matter. . . . (*K.S., supra,* SPB Precedential Dec. No. 17–02 at p. 9.) Spence denied that such a conversation took place. Resolving this conflict requires a credibility determination using the criteria provided by Evidence Code section 780.

"When determining credibility, the trier of fact may consider 'any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness's] testimony,' including witness demeanor; character of testimony; extent of the witness's ability to perceive, recollect or communicate any matter about which she or he testifies; the existence or nonexistence of bias, interest or motive; the existence or nonexistence of any fact testified to by the witness; and the witness's attitude toward the action or testimony. (Evid. Code, § 780, subds. (a), (b), (c), (d), (f), (i) & (j).)

"Appellant generally testified in a clear manner and candidly admitted conduct that did not portray him in a good light. However, Appellant exhibited some difficulty recalling details and appeared to be evasive at times. Although Warden Hernandez had difficulty recalling specific dates of events that occurred several years ago, he demonstrated a specific recollection of his discussion with Appellant. Warden Hernandez testified in a clear, consistent, and unexaggerated manner. Warden Hernandez's testimony is logical because Sgt. Vasquez filed a complaint against Appellant during the time period Warden Hernandez said he discussed the matter with Appellant. Warden Hernandez had been retired for more than eight years at the time of hearing, and had no apparent interest in the outcome of the

4

matter.  Also, Warden Hernandez displayed no animosity toward Appellant, and had no apparent motive to testify in a manner unfavorable to Appellant. [¶] Accordingly, Warden Hernandez's testimony is credited over Appellant's testimony." (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at p. 9.)

*Prior Adverse Actions*

Spence was also subject to other adverse actions, as discussed in the Demotion Action:  "Respondent [CDCR] issued Appellant a 10-percent salary reduction for 13 months, effective on March 31, 2015, for borrowing money from CO Jeffrey Springer . . . .  This [notice of adverse action (NOAA)] recited Warden Hernandez's direction to Appellant not to borrow money from CO's. Respondent also issued Appellant a 5-percent salary reduction for 24 months, effective April 30, 2015, for failing to submit his time sheets in a timely manner.  Appellant appealed both adverse actions, and the parties entered into a stipulated settlement to resolve both appeals by consolidating both adverse actions into a single, combined official reprimand.  [Footnote 2:  This proposed decision shall refer to the combined, stipulated adverse action as the 2015 Consolidated Reprimand.] [¶] In March 2016, Appellant received an adverse action of suspension for 15 work days for collecting money from CO's to purchase coupon books as part of a youth sports organization fundraiser, and failing to deliver the coupon books or refund the money to those CO's." (*K.S., supra*, SPB Precedential Dec. No. 17–02 at p. 5.)

*Lopez Loan*

The Demotion Action involved two loans by subordinate officers to Spence.  CO Richard Lopez in February 2014 loaned Spence $2,000, after Spence had asked to borrow $5,000 and had promised to repay the money the following month.  Although Lopez and Spence worked in the same general area at RJD, they did not have a personal relationship or socialize outside of

5

work.  Spence ultimately ended up repaying Lopez only $300 of the money he had borrowed.  (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at pp. 6-7.)

The ALJ in the Demotion Action found Government Code section 19635 prohibited CDCR from disciplining Spence for initially borrowing the money from Lopez because that activity occurred more than three years before service of the NOAA in that action.  (*K.S., supra*, SPB Precedential Dec. No. 17–02 at p. 11.)  However, the ALJ also ruled any conduct of Spence regarding the Lopez loan that occurred within three years of the NOAA in the Demotion Action could be considered in determining whether to discipline Spence.  (*Id.* at p. 15.)

*Mack Loan*

The other loan in the Demotion Action involved CO Otis Mack, who Spence supervised at RJD.  Similar to Lopez, Spence and Mack did not have a personal relationship and did not socialize outside of work.  In late April or early May 2016, Spence telephoned Mack at home and asked to borrow $200.  Mack felt sorry for Spence and agreed to make the loan.  Spence promised to repay the money in the next pay period.

Over the course of several months, Mack asked Spence to repay the loan.  On each occasion Spence made an excuse why he could not do so and, as of August 2017 when the Demotion Action went to hearing, Spence still had not repaid the $200 he borrowed from Mack.  (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at p. 8.)

*Time Sheets*

Similar to the 2015 Consolidated Reprimand and the instant case, the Demotion Action also involved Spence's failure to timely submit completed and signed time sheets.  CDCR in the Demotion Action alleged Spence failed to submit time sheets for the pay periods between September 2015 and

6

August 2016, despite receiving monthly notices at his home address stating he had failed to submit a time sheet along with a duplicate time sheet with instructions to complete it. (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at p. 8.)

*Legal Conclusions*

The ALJ in the Demotion Action reached the following conclusions: "Appellant's conduct constitutes cause for discipline under Government Code section 19572, subdivisions (b) incompetency, (c) inefficiency, (d) inexcusable neglect of duty, (e) insubordination, (o) willful disobedience, and (t) other failure of good behavior. . . . [¶] Demotion from the position of Correctional Lieutenant to the position of CO is a just and proper penalty." (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at p. 25.)

In reaching these conclusions, the ALJ found Spence "had a known duty not to borrow money from subordinate employees. Warden Hernandez specifically directed Appellant not to borrow money from subordinate employees. In addition, the 2015 Consolidated Reprimand specifically punished Appellant for borrowing money from CO Springer. Furthermore, a supervisor's solicitation of personal loans from a subordinate employee is so clearly improper that specific notice is not necessary. Appellant should have known that asking a subordinate employee to borrow money may cause that employee to feel pressure to loan money to his supervisor, and may create the appearance that Appellant's supervisorial decisions could be affected because of the employee's decision whether to loan money. Thus, even if Appellant had not received explicit direction, he should have known he had a duty not to solicit personal loans from subordinate employees. Appellant breached this known duty when he asked CO Mack for a loan." (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at p. 17.)

7

The ALJ also found Spence "had a known duty to turn in his monthly time sheets in a timely manner. Appellant was aware of the requirement under [CDCR's Department Operations Manual] section 31080.7.9, as the 2015 Consolidated Reprimand specifically punished Appellant for his earlier failure to submit time sheets in a timely manner. Despite his known duty to submit time sheets in a timely manner, Appellant repeatedly failed to do so for a period of one year. [¶] Appellant's conduct therefore constitutes cause for discipline . . . ." (*K.S.*, *supra*, SPB Precedential Dec. No. 17–02 at p. 18.)

Instant Action[4]

*Office of Internal Affairs Interview re: CO Springer*

As noted *ante*, in May 2014 Spence asked CO Springer for a $500 loan, which loan was the subject of the 2015 Consolidated Reprimand. Springer felt pressured and obligated to lend Spence the money because Spence then was a correctional lieutenant, a second line supervisor of CO's, and had the authority to give a CO such as Springer a direct order. Spence told Springer he would repay him in two installments beginning in July 2014.

Springer repeatedly contacted Spence both in person and via e-mail, text messages, and phone calls, after Spence failed to repay him. In September 2014, Spence paid Springer $100. Still owed $400, in November 2014 Springer prepared a written memorandum to the RJD warden regarding the loan, explaining he felt pressured to make it because Spence outranked him, and asking for help to recoup the money. In December 2014, Spence repaid Springer the balance due under the loan.

On October 17, 2016, Spence was scheduled to meet with CDCR's Office of Internal Affairs (OIA) in connection with allegations that he borrowed

---

[4]    The instant action also referenced the prior adverse actions discussed *ante*.

8

money from subordinate officers that culminated in the Demotion Action. As discussed in more detail *post*, the night before the investigatory interview Spence called Springer at work and asked Springer whether he had stated in the written memorandum that Spence had used his rank to secure a loan from Springer, whether he had attempted to withdraw the written memorandum and, if so, whether RJD administration had resisted his attempt to do so. Toward the end of the conversation after Springer had refused to withdraw the memorandum, Spence suggested Springer may "end up in court." Springer felt Spence was harassing him by calling him at work and threatening to retaliate against him if he did not withdraw the memorandum.

*Kennard*

On or about November 26, 2015, Spence approached CO Trevion Kennard during a shift at RJD. After some small talk, Spence asked Kennard for his personal cell phone number, despite the fact Kennard had only been working at RJD for about a year and a half, had no prior existing relationship with Spence, and had only known Spence through work. Shortly after Spence's shift ended, he called Kennard and disclosed he was going through a difficult time and asked Kennard to "spot him $200." Spence told Kennard he was parked at a nearby gas station that had an ATM where Kennard could withdraw the money.

Kennard felt pressure to give Spence the money because Spence then was a correctional lieutenant. Kennard also feared Spence would retaliate against him if he did not make the loan. Kennard met Spence at the gas station, withdrew $200, and gave it to Spence, who promised to repay Kennard as soon as his adverse action concluded.

About three weeks later, Spence called Kennard and again asked to borrow money. Kennard told Spence he did not have the money to loan him. Spence in response said he would pay Kennard $200 for an additional $100 loan. Although concerned Spence would use his rank to negatively affect Kennard's job status at RJD, Kennard refused to loan Spence more money.

Kennard called Spence between 10 and 15 times to collect the $200 Spence had borrowed. Spence gave Kennard various excuses why he could not repay him. At the evidentiary hearing in this case, Spence admitted he still owed Kennard $200.

*Dunlap*

Shortly after completing his suspension in April 2016 for selling "coupon books" to subordinate officers and failing either to deliver the books or refund their money, Spence asked to borrow $400 from CO John Dunlap. On the day Spence asked for money, he engaged Dunlap in conversation several times while Dunlap was assigned to the C Plaza gate at RJD. On his fourth time through the gate, Spence told Dunlap he had just finished serving a 45-day suspension allegedly for refusing to write up a CO. Spence asked for Dunlap's cell phone number.

After his shift ended, Dunlap received a telephone call from Spence asking to borrow $400. Dunlap was "shocked" by Spence's request, as Dunlap believed it was inappropriate for a superior officer to be asking subordinate officers for money. Dunlap initially refused to make the loan. Spence persisted, however, noting he made "good money" and would be able to repay Dunlap during "the next pay period." Dunlap eventually agreed to the loan and met Spence about 20 minutes later at an ATM. Dunlap told Spence he really could not afford to make the $400 loan and "needed" it returned as promised by Spence. Spence assured Dunlap he would repay the money

10

during the next pay period; and instructed him not to tell anyone about the loan, adding he previously had gotten into trouble for "using his position for his own gain."

The next day, Spence called Dunlap and asked for an additional $300, claiming he had used the $400 he had just borrowed to pay a utility bill. Dunlap was reluctant to loan Spence any more money. Spence promised to repay all the money before the end of the month. Although Dunlap found Spence's request stressful, he agreed to the additional $300 loan.

As was the case with some of the other CO's he borrowed money from, Spence failed to pay Dunlap back as promised. Dunlap on several occasions spoke with Spence about repayment of the two loans. Spence in June and again in September 2016 made partial payments to Dunlap, but did not repay the full amount of the loan, despite Dunlap's myriad attempts to recoup his money. In January 2017, Spence stopped returning Dunlap's messages and when they saw each other at work, Spence ignored Dunlap. Dunlap eventually filed a written complaint against Spence. In his complaint, Dunlap stated he felt victimized by Spence in what he described as Spence's "unethical behavior and predatory tactics" in connection with the loan, and expressed concern Spence was engaging in similar conduct with other subordinate officers.

*Martinez*

On or about December 12, 2016, Spence asked CO Jose Martinez for a $300 loan. Spence at the time was one of Martinez's direct supervisors. Spence had another CO summon Martinez to Spence's office. On arrival, Spence asked Martinez to close the door and then asked for his personal cell

phone number. Martinez was excited by these events as he believed Spence was about to offer him a management position.

Shortly after his shift ended, Spence called Martinez, told him he was in the middle of a divorce, and asked to borrow $300, promising to repay the money on December 17. Spence in fact had been untruthful about why he needed the money, as Spence used it to gamble.[5]

The following day, Spence called Martinez and asked to borrow an additional $300. Martinez refused, stating he could not afford to loan Spence any more money. Spence appeared frustrated and upset by Martinez's refusal to make the additional loan.

Spence did not repay Martinez as promised. Martinez called Spence about 15 to 20 times asking about repayment. Spence in response began to avoid Martinez at work. In March 2017, Martinez submitted a written memorandum to the RJD warden detailing the circumstances of the loan and Spence's failure to repay the money, and asking for assistance in resolving the matter. In August 2017, Spence and Martinez met in a parking lot at RJD to discuss repayment of the loan, after Martinez had encountered Spence in the RJD accounting office and had once again asked about repayment. Spence then claimed he had the money to repay Martinez but allegedly could not do so because of the memorandum prepared by Martinez. Spence promised to talk to his attorney and get back to Martinez. At the time of the hearing in the instant case, Spence still had not repaid Martinez.

---

[5] Spence in the instant action did not testify when he sought help through CDCR's employee assistance program (EAP). However, the ALJ in the Demotion Action found Spence had contacted EAP in August 2016 and had begun attending Gamblers Anonymous meetings in October 2016.

*Time Sheets*

During the relevant time period, Spence was required to submit a completed and signed Employee Record of Attendance (CDCR 998-A) form (i.e., time sheet) by the third day of each pay period. The time sheets show if an employee has used any accrued leave or was absent during any given month, and certify the time entered is correct. As of July 2017, Spence had not submitted times sheets for January, February, March, and April 2017. Each month Spence failed to submit a time sheet, as before CDCR mailed him a reminder that included a duplicate time sheet along with instructions to complete and submit it. Because Spence took leave in each of these months, CDCR was unable to accurately determine his pay.

*OIA Interviews*

CDCR's OIA interviewed Spence on March 7, 2017. During this interview, Spence denied harassing Springer or attempting to persuade him to withdraw his 2014 memorandum. OIA interviewed Spence a second time on March 14, 2017. During the March 14 interview, Spence "denied that anyone had ever told [him] not to borrow money from subordinates."

*Dismissal and Appeal*

In November 2017, CDCR served Spence with a NOAA dismissing him from his position as a CO effective November 30, 2017. In the NOAA, CDCR alleged Spence violated Government Code section 19572, subdivisions (b) incompetency, (c) inefficiency, (d) inexcusable neglect of duty, (e) insubordination, (f) dishonesty, (m) discourteous treatment, (o) willful disobedience, (t) other failure of good behavior, and (x) unlawful retaliation. The NOAA further alleged Spence violated these various subdivisions by (1) wrongfully retaliating against Springer, a subordinate officer; (2) wrongfully borrowing money from subordinate officers Kennard, Dunlap, and Martinez;

13

(3) failing to timely submit time sheets; and (4) being dishonest during the OIA interviews. Spence appealed.

Following a June 2018 hearing, the ALJ on October 19, 2018, issued his proposed decision sustaining the NOAA and the penalty of dismissal. In the proposed decision, the ALJ concluded that Spence's conduct constituted cause for discipline under each of the alleged subdivisions of Government Code section 19572 except for (x) unlawful retaliation. On December 13, 2018, as noted, SPB adopted the proposed decision without modification. Spence on March 6, 2019, filed the Petition to set aside the December 13 decision of SPB.

On August 16, 2019, the trial court denied Spence's Petition. It found that the ALJ's application of issue preclusion/collateral estoppel was "not prejudicial"; that substantial evidence supported the dishonesty charges; and that there "was no procedural unfairness or lack of due process" based on Spence's argument he was treated unfairly because he was not given "progressive discipline." The August 16 order was incorporated into an August 29, 2019 judgment denying Spence's Petition.

DISCUSSION

A. *Guiding Principles*

On a petition for administrative mandamus, we determine whether the agency has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion by the agency. (§ 1094.5, subd. (b); *City of Hesperia v. Lake Arrowhead Community Services Dist.* (2019) 37 Cal.App.5th 734, 748.) Abuse of discretion "is established if the respondent [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).)

14

SPB is an agency of constitutional authority vested with quasi-judicial powers. (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125 (*Coleman*); *Telish v. State Personnel Bd.* (2015) 234 Cal.App.4th 1479, 1487 (*Telish*).) As such, its decisions are reviewed only to determine whether substantial evidence supports its findings. (*Coleman*, at p. 1125; *Furtado v. State Personnel Bd.* (2013) 212 Cal.App.4th 729, 742.)

The role of an appellate court in reviewing an SPB decision on a petition for writ of administrative mandamus is the same as of the trial court decision. (*Department of Corrections & Rehabilitation v. State Personnel Bd.* (2016) 247 Cal.App.4th 700, 707.) We apply the substantial evidence rule, examining "all relevant evidence in the entire record, considering both the evidence that supports the Board's decision and the evidence against it, in order to determine whether that decision is supported by substantial evidence." (*Telish, supra,* 234 Cal.App.4th at p. 1487.) "This does not mean, however, that a court is to reweigh the evidence; rather, all presumptions are indulged and conflicts resolved in favor of the Board's decision." (*Ibid.*)

To the extent the appeal presents questions of law, our review is de novo. (*Fisher v. State Personnel Bd.* (2018) 25 Cal.App.5th 1, 13; *Pollak v. State Personnel Bd.* (2001) 88 Cal.App.4th 1394, 1404.)

B. *Issue Preclusion*

1. Additional Background

The ALJ in the instant case found the Demotion Action "involved certain of the same issues present in this matter," adding: "The hearing in [the Demotion Action] was held in August, 2017. Appellant and Respondent were the same, and only, parties to the both actions. The same counsel appeared on behalf of their respective clients at both hearings. Under his authority under California Code of Regulations, title 2, section 56.1, to

15

control the proceedings, and under principles of collateral estoppel, the undersigned informed the parties at the beginning of the proceedings they would not be able to re-litigate the matters decided in [the Demotion Action].

"Among other things, the issue of whether Warden Hernandez had a meeting with Appellant in which he directed Appellant not to borrow money from subordinates was litigated in [the Demotion Action].  There, the ALJ reviewed the evidence presented by both parties about the nature and content of the meeting between Warden Hernandez and Appellant in the 2008 to 2009 time period and made factual determinations about it.  The ALJ found that Warden Hernandez received Sgt. Vasquez's complaint about Appellant borrowing money from subordinates, that Warden Hernandez called Appellant to his office to discuss the complaint, that Warden Hernandez told Appellant to pay Sgt. Vasquez back, and that Warden Hernandez told Appellant not to borrow money from subordinates again.  The undersigned informed the parties in the present action that the issue of the meeting between Warden Hernandez and Appellant, having been previously litigated and the ALJ's determination relied upon by the Board in reaching its decision in [the Demotion Action] would stand for the present case."  (Fn. omitted.)

In so doing, the ALJ was clear that, while this issue had been previously litigated, whether Spence had been dishonest during his March 2017 OIA interview was still to be decided.  The ALJ in the present action thus noted CDCR was "allowed to present Warden Hernandez to testify about the meeting for the sole purpose of [assessing] the current dishonesty charge."

16

2. Guiding Principles and Analysis

The term " 'res judicata' " is often used "as an umbrella term encompassing both claim preclusion and issue preclusion, which [is] described as two separate 'aspects' of an overarching doctrine. [Citations.] Claim preclusion, the ' " 'primary aspect' " ' of res judicata, acts to bar claims that were, or should have been, advanced in a previous suit involving the same parties. [Citation.] Issue preclusion, the ' " 'secondary aspect' " ' historically called collateral estoppel, describes the bar on relitigating issues that were argued and decided in the first suit." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.)

" ' "The prerequisite elements for applying the doctrine to either an entire cause of action or one or more issues are the same: (1) A claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding." ' " (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797 (*Boeken*).)

We independently conclude that the ALJ did not err in applying issue preclusion in this case. (See *Noble v. Draper* (2008) 160 Cal.App.4th 1, 10 [application of the doctrine of issue preclusion is a question of law subject to de novo review]; *Groves v. Peterson* (2002) 100 Cal.App.4th 659, 667 [same].) The issue litigated in the Demotion Action (and in the 2015 Consolidated Reprimand) was identical to the issue Spence sought to litigate in the instant action, namely whether Hernandez during a 2008/2009 meeting instructed Spence to refrain from borrowing money from subordinate officers, after Vasquez had filed a written memorandum that came to Hernandez's attention as a result of Spence's failure to repay a loan made by Vasquez.

17

Moreover, as the ALJ noted the parties in the instant case are the same as in the Demotion Action (and the 2015 Consolidated Reprimand); and SPB's decision in the Demotion Action is final and deemed precedential, as Spence did not appeal that decision. As such, we conclude the ALJ properly invoked issue preclusion to prevent Spence from relitigating the issue of whether he was instructed by Hernandez not to borrow money from subordinate officers. (See *Boeken*, *supra*, 48 Cal.4th at p. 797.)

In light of our conclusion, we reject Spence's related argument that he was denied a "fair" administrative hearing under section 1094.5, subdivision (b) because he allegedly was denied the opportunity to fully present his defense that no such meeting between him and Hernandez ever took place.[6]

3. Harmless Error

Assuming the ALJ erred by applying issue preclusion, we conclude that error was harmless. Indeed, the ALJ separately found that even if Hernandez in 2008/2009 had not instructed Spence to stop borrowing money from subordinate officers, Spence nonetheless should have known from the Demotion Action and the 2015 Consolidated Reprimand—where he was punished for borrowing money from subordinate officers—and from the

---

[6]     As a result of our decision on this issue, we reject Spence's contention that Hernandez's testimony was insufficient to support the ALJ's separate legal conclusion that Spence was dishonest during the March 13, 2017 OIA interview when he stated he was never told by Hernandez to stop borrowing money from other CO's.

18

obvious impropriety of seeking loans from coworkers, that such behavior constituted serious misconduct supporting his dismissal from CDCR.[7]

C. *Progressive Discipline*

Spence next contends his dismissal violated due process of law because CDCR did not follow the tenets of progressive discipline set forth in the precedential SPB decision *In re R.N.* (1992) SPB Dec. No. 92-07 (*R.N.*). CDCR argues Spence offered no legal authority (other than the *R.N.* decision itself) or record citation to support this contention. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [failure to cite legal authority forfeits appellate review of issue].)  In any event, CDCR argues *R.N.* is inapplicable. We agree with CDCR on this latter point.

Here, as noted *ante* the record shows Hernandez instructed Spence in 2008/2009 not to borrow money from subordinate officers, after Vasquez complained when Spence failed to repay him.  Spence was disciplined in 2015 for again borrowing money from a subordinate officer and not repaying the loan, as noted in the 2015 Consolidated Reprimand, and again in 2017 in the Demotion Action, as also summarized *ante*.  In addition, the ALJ in the Demotion Action found a supervisor's solicitation of personal loans from subordinate employees was "so clearly improper" that Spence should have

---

[7]     Spence also contends that the ALJ erred in applying issue preclusion because counsel for CDCR allegedly withdrew this affirmative defense during an unreported discussion between counsel and the ALJ.  We note the ALJ referenced this discussion after a lunch break, stating CDCR counsel wished to withdraw her request that certain "facts" be established by issue preclusion/collateral estoppel, but neither the ALJ nor counsel identified those "facts" on the record.  In any event, as a result of our conclusion that application of issue preclusion in this case was harmless error, we reject this contention even assuming arguendo CDCR withdrew this defense in connection with the 2008/2009 meeting between Hernandez and Spence.

19

known not to solicit personal loans from his coworkers even if Hernandez had not given him this explicit instruction.

The current case, involving repeated willful and serious misconduct by Spence over the course of many years, is readily distinguishable from *R.N.*, which involved a correctional officer who, over a 14-month period, fell asleep three times while on duty. In *R.N.*, SPB modified R.N.'s dismissal to a six-month suspension, finding that, in cases of poor work performance, CDCR should follow a sequence of warnings or lesser disciplinary actions before imposing the ultimate penalty of dismissal. (*R.N.*, *supra*, SPB Dec. No. 92-07 at p. 6.)

SPB in *R.N.* noted the purpose of progressive discipline "is to provide the employee with the opportunity to learn from prior mistakes and to take steps to improve his or her performance on the job."[8] (*R.N.*, *supra*, SPB Dec. No. 92-07 at p. 6.) SPB determined in *R.N.* that CDCR did not discipline the plaintiff in a timely fashion, thus allowing her performance problems to accumulate and go undisciplined before progressive discipline was initiated; and that her dismissal did not take into account her improvement after she was transferred to another post. (*Id.*, at p. 7.)

In addition, the record shows that unlike the plaintiff in *R.N.*, Spence in the instant case was subject to progressive discipline. Indeed, as we have repeatedly noted, Hernandez warned Spence in 2008/2009 not to borrow money from subordinate officers. Despite this warning, and the fact borrowing money from subordinate officers—including some directly supervised by Spence—was clearly inappropriate even *if* Hernandez had not

---

[8] SPB also noted, however, that while progressive discipline is well-suited to treating problems of poor work performance, "serious willful misconduct on the part of an employee may well warrant dismissal in the first instance." (*R.N., supra,* SPB Dec. No. 92-07 at p. 6, fn. 3.)

previously so instructed Spence, the record shows Spence in 2014 obtained a loan from Springer, who felt pressured and obligated to make the loan because Spence was his superior officer. Ultimately Spence was subject to an adverse action—a 10 percent salary reduction for 13 months—effective on March 31, 2015, for borrowing money from Springer. Despite being punished in the 2015 Consolidated Reprimand, Spence again borrowed money from Lopez and Mack, which loans were the subject of the Demotion Action.[9] We note the Mack loan took place in May 2016, *after* Spence had been subject to adverse action in the 2015 Consolidated Reprimand.

In the instant case, Spence again borrowed money from subordinate officers, all of which again occurred *after* he had been subject to adverse action in the 2015 Consolidated Reprimand for the *same* misconduct. Spence borrowed money from Kennard in November 2015, from Dunlap in April 2016, and from Martinez in December 2016. In each instance he failed to repay all the money. In connection with the loan from Dunlap, Spence went so far as to instruct this CO not to tell anyone about the loan, noting he previously had been in trouble for " 'using his position for his own gain.' " Thus, unlike the plaintiff in *R.N.*, the record shows Spence in the instant case received progressive discipline before he was dismissed by CDCR. For this separate reason, we find the *R.N.* decision inapplicable in the instant case.

We also reject Spence's argument he was improperly dismissed because he already had been demoted from Lieutenant CO to CO in connection with the Demotion Action. As summarized *ante*, the NOAA in the Demotion

---

[9]    As noted *ante*, the ALJ found Spence could not be disciplined for borrowing money from Lopez because that incident occurred more than three years before CDCR filed its NOAA in the Demotion Action. As also noted, however, the ALJ found any conduct occurring within three years of the NOAA regarding the Lopez loan could be cause for discipline.

Action only involved the Lopez and Mack loans, and Spence's failure to timely submit time sheets between September 2015 and August 2016. However, the NOAA in the instant case involved three *additional* loans, as noted; Spence's failure to timely submit time sheets for a different time period (i.e., January through April 2017); *and* his conduct in connection with the March 2017 OIA interviews. That the ALJ found demotion was the appropriate penalty in the Demotion Action in no way prevented the ALJ in a separate administrative proceeding—subject to a separate NOAA—from recommending dismissal, as adopted by SPB.

Furthermore, we reject Spence's due process challenge to his dismissal as the record shows that he fully participated in the multiday hearing before the ALJ, including calling and cross-examining witnesses, and offering his own testimony; and that he was dismissed as a CO only after the ALJ found Spence had (1) engaged in serious willful misconduct, including, as Spence admitted, borrowing money from subordinate officers "under false pretenses, and then failing to repay them"; and (2) been dishonest during his March 2017 interviews with OIA when he denied (i) trying to persuade Springer to withdraw his November 2014 memorandum complaining that Spence had borrowed money and failed to repay it, and (ii) receiving instruction from Hernandez to stop borrowing money from subordinate officers.

D. *Sufficiency of the Evidence*

Spence argues the evidence is insufficient to support the finding that during the October 16, 2016 telephone call with Springer he attempted to persuade Springer to withdraw his November 2014 memorandum. Specifically, Spence argues the ALJ recognized that Springer "appeared to be exaggerating as he testified about the number and content of the calls" from Spence after Springer wrote the memorandum; and that Springer only

22

memorialized the one call on October 16, despite claiming there had been several threatening calls made by Spence between November 2014 and October 2016.  Spence thus contends the ALJ's decision to credit the October 16 call by Spence but not the others show the former finding is not supported by substantial evidence.  We disagree.

1.  The October 16 Telephone Call

The record shows at the time of the administrative hearing, Springer had been a CO at RJD for 11 years.  Prior to his employment with CDCR, Springer had been in the Marine Corps for more than eight years, from which he was honorably discharged.

Springer testified that shortly after his shift began at 10:00 p.m. on October 16, 2016, he received a telephone call on an RJD landline.  Because he was busy with his assignment, Springer picked up the call on speakerphone.  Initially, Springer could not determine the identity of the caller.  After some small talk, the caller asked Springer to take him off speakerphone.  After Springer complied, the caller identified himself as Spence and in a "friendly" manner asked Springer how he was doing.  Springer was unsure whether he should be speaking with Spence, as OIA had given Springer a directive to refrain from communicating with Spence during its investigation.  Because Spence had repaid the loan and was otherwise friendly on the phone, Springer decided to have a short conversation with Spence, as Springer was otherwise busy at work and his supervisor was present.

Once off speakerphone, Springer testified that Spence's demeanor "changed a little bit."  Spence began to question Springer about the November 2014 memorandum, leading Springer to believe that Spence was still "pretty pissed off" at him for writing it.  Springer explained he wrote the

23

memorandum because he had loaned Spence $500, had then only been repaid $100, and had wanted to let the warden know about the loan because he felt "played" by Spence.

As they continued to talk on the telephone, Spence raised his voice at Springer and, while "breathing hard," asked Springer, "hey, what's up with the fucking memo, man? . . . You said you're going—you're going to pull it. What's up?" Springer explained to the ALJ that he was concerned by Spence's call, particularly because he was on duty when it came in, and because he believed the matter had been resolved as Spence had since repaid the loan. As they spoke on the telephone, Spence began talking over Springer, telling him, "hey, look, if you were trying to withdraw that memo, they cannot hold you or tell you not to withdraw it [¶] . . . [¶]—and basically just telling me they can't do that. If you want to withdraw something, you should be able to do that." As noted *ante*, near the end of the call Spence said: "hey, look, man, you might end up in court but just in a different way[.]" Springer interpreted this statement to mean that Spence might sue him for writing the memorandum and refusing to withdraw it.

2. The ALJ's Findings and Conclusions of Law

As noted, the ALJ found CDCR proved by a preponderance of the evidence that during the October 16 call Spence first attempted to persuade Springer to withdraw his November 2014 memorandum and, when he did not do so and explained he also had not tried to do so, Spence next threatened to retaliate against him. These findings supported the ALJ's legal conclusions that Spence's conduct on October 16 constituted (1) inexcusable neglect of duty; (2) dishonesty; (3) discourteous treatment of another employee; (4) willful disobedience; and (5) other failure of good behavior.

24

3.  Substantial Evidence Supports the ALJ's Findings Regarding the October 16 Telephone Call

We conclude the record evidence is more than sufficient to support the ALJ's finding that on October 16 Spence called Springer at work in an attempt to convince Springer to withdraw the November 2014 memorandum; and that, when Springer refused, Spence threatened retaliation.  (See *Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1490 [noting that "[o]nly if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence"].)

That the ALJ credited certain testimony by Springer and not his other testimony does not change our decision, as the ALJ as trier of fact was entitled to believe all, some, or none of Springer's testimony.  (See Evid. Code, § 780.)  As a court of review, we neither reweigh the evidence nor reevaluate a witness's credibility; rather, we examine "all relevant evidence in the entire record, considering both the evidence that supports the Board's decision and the evidence against it, in order to determine whether that decision is supported by substantial evidence." (*Telish, supra,* 234 Cal.App.4th at p. 1487.)  Based on this record, we find substantial evidence supports the ALJ's findings regarding the October 16 telephone call in which Spence threatened retaliation against Springer unless he withdrew the memorandum.

4.  Harmless Error

Assuming there is insufficient evidence to support the ALJ's finding that Spence, on the eve of his OIA interview, threatened to retaliate against Springer if he did not withdraw the November 2014 memorandum, we nonetheless conclude that error is harmless.  Indeed, separate and apart from

the findings in connection with the October 16 call, there were *other* factual findings made by the ALJ, based on evidence that Spence has *not* challenged on appeal, which support various legal conclusions by the ALJ on which Spence's dismissal is separately based.

As noted *ante*, the ALJ found Spence's conduct constituted inexcusable neglect of duty as he had been "ordered . . . not to borrow money from subordinate officers," which "direction" was then well-known to Spence and which direction he chose to ignore when he again borrowed money from subordinate officers Kennard, Dunlap, and Martinez. The ALJ also found Spence's failure to timely submit signed time sheets separately constituted inexcusable neglect of duty. Thus, even assuming arguendo the ALJ erred in considering Springer's testimony regarding the October 16 telephone call, the other evidence and findings not challenged by Spence on appeal fully support the ALJ's conclusion that Spence's conduct constituted inexcusable neglect of duty.

Similarly, the ALJ found evidence other than the October 16 telephone call supported the conclusion that Spence was willfully disobedient in that he knowingly and intentionally violated a direct command, prohibition, or policy, noting: "[D]espite CDCR's prohibition against a superior officer borrowing money from a subordinate, and prior action against him, Appellant continued to borrow money from subordinates. So too with the time sheets, despite CDCR's policy requiring the timely submission of signed time sheets, and prior action against him, Appellant continued to fail to turn in his time sheets in a timely manner."

Moreover, the ALJ found this same misconduct by Spence also constituted other failure of good behavior, as this misconduct was rationally related to his employment with CDCR. Thus, even if the ALJ abused its

26

discretion and erred in crediting Springer's testimony regarding the October 16 telephone call, any such error was harmless in light of the other evidence that supported the penalty of dismissal.

## DISPOSITION

The judgment affirming the denial of Spence's Petition under section 1094.5 is affirmed. Respondent and real party in interest CDCR shall recover its costs on appeal, as shall respondent SPB to the extent it incurred any such costs.

BENKE, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.

27